UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK


UNITED STATES DISTRICT COURT
FILED
NOV 2 0 2018
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

———————————————————————————

THE PIKE COMPANY, INC.,

     Plaintiff,

  v.

TRI-KRETE LIMITED,

     Defendant.

———————————————————————————

**DECISION AND ORDER**

6:18-CV-06311 EAW

## <u>INTRODUCTION</u>

Plaintiff The Pike Company ("Pike") commenced this action on April 20, 2018, against Defendant Tri-Krete Limited ("Tri-Krete") for breach of contract. (Dkt. 1). On June 25, 2018, Tri-Krete filed an Answer, denying all material allegations in the Complaint and setting forth various affirmative defenses. (Dkt. 5). Tri-Krete also asserted several counterclaims against Pike, which included common law causes of action for breach of contract and unjust enrichment, and violations of the New York Prompt Payment Act, N.Y. Gen. Bus. Law §§ 756-758 ("PPA"). (*Id.* at 4-7).

Contemporaneously with the filing of its Answer, Tri-Krete filed a motion to stay this action and to compel arbitration based upon the alleged PPA violations. (Dkt. 7). Within the days thereafter, Pike responded with a motion to stay arbitration. (Dkt. 9). Pike subsequently filed a motion for a preliminary injunction, seeking to enjoin the arbitration proceedings. (Dkt. 22). For the following reasons, Tri-Krete's motion to stay this action and compel arbitration (Dkt. 7) is granted, Pike's motion to stay arbitration (Dkt. 9) is denied, and Pike's motion for a preliminary injunction (Dkt. 22) is denied.

## BACKGROUND

Pike served as the construction manager contractor with Marist College on a campus housing project located in Poughkeepsie, New York (the "Marist Project"). (Dkt. 9-2 at ¶¶ 1, 3). Pike awarded Tri-Krete a subcontract to complete architectural precast work for the Marist Project. (*Id.* at ¶ 4; *see* Dkt. 29-1 at ¶¶ 2-3). The parties executed a Master Subcontract Agreement and a Work Order, dated October 2, 2015, and June 14, 2016, respectively (collectively, the "Subcontract"), which governed their relationship as it related to the Marist Project. (Dkt. 9-2 at ¶ 4; *see* Dkt. 11).

The Subcontract "required payment applications to be submitted by uploading the application to an online invoicing system called Textura." (Dkt. 29-1 at ¶ 9; *see* Dkt. 9-2 at ¶ 9; *see also* Dkt. 11 at 30 ("Unless otherwise directed or authorized, in writing, by Contractor, all Applications for Payment and supporting documents for Subcontractor and its sub-subcontractors and suppliers, shall be in electronic format and shall be submitted to Contractor using the *Textura* Payment Management System. . . .")). Pike needed to make the Textura system accessible every month so that Tri-Krete could submit the required payment application by the 25th day of that month. (*See* Dkt. 29-1 at ¶ 9; *see* Dkt. 9-2 at ¶ 9). According to Pike, "[s]ubcontractors submit 'pencil copies' of their payment applications via Textura," which then generate electronic reports. (Dkt. 9-2 at ¶ 9). Once submitted, "[t]he pencil copy is reviewed by Pike," and "[i]f appropriate, the pencil copy is approved in the system." (*Id.*). Pike would also notify Tri-Krete if the "invoice require[d] any modification." (Dkt. 11 at 30; *see* Dkt. 29-1 at ¶ 9).

According to Tri-Krete's Vice President, Adam Bombini ("Bombini"), the company submitted Payment Application 12 ("App 12") and Payment Application 13 ("App 13") to the Textura system on June 24, 2017, and July 22, 2017, respectively. (*See* Dkt. 29-1 at ¶¶ 11, 25). Bombini states that Pike never asked for additional information nor did it expressly reject App 12 or App 13. (*Id.* at ¶¶ 11-12, 26-27).

Pike's Project Director, Daniel L. DeCarlo ("DeCarlo"), and Pike's Senior Project Manager, Gloria Ciminelli ("Ciminelli"), dispute the veracity of these submission dates, and instead they contend that App 12 and App 13 were both submitted on July 19, 2017. (Dkt. 9-2 at ¶ 10; Dkt. 34-1 at ¶ 15). Furthermore, DeCarlo also states that on July 24, 2017, Pike informed Tri-Krete that it was in default of certain obligations under the Subcontract, and that Pike was incurring "significant expenses and damages that exceeded Tri-Krete's pending payment application." (Dkt. 9-2 at ¶ 11; *see* Dkt. 10-5).[1] In addition, DeCarlo refers to email communications, taking place between August 3, 2017, and August 4, 2017, in which he demanded that Bombini "immediately deliver a detailed accounts receivable/payable report for all Tri-Krete sub-subcontractors, vendors and suppliers, including documentation showing any unpaid cost liabilities related to Tri-Krete's performance." (Dkt. 9-2 at ¶ 12). DeCarlo insists that due to "the pending notices of default" and his unsatisfied demand for certain documentation, Tri-Krete "was clearly on

---

[1]     The Court notes that the "pending payment application" referred to within the referenced correspondence was Tri-Krete's Payment Application 11, which was submitted in May 2017. (*See* Dkt. 10-5). As Bombini avers in his affidavit, the "July 24, 2017 letter does not even mention Tri-Krete's payment application 12 and does not reject payment application 12 under New York State's Prompt Payment Act." (Dkt. 29-1 at ¶ 14).

notice that its payment application No. 12 was not approved and was disputed." (*Id.* at ¶ 13).

After July 2017, the parties apparently abandoned the Textura invoicing system. According to Bombini, Pike "locked Tri-Krete out of Textura so Tri-Krete could not submit [invoices 8880, 8893, 8894, 8915, and 8916] via Textura." (Dkt. 29-1 at ¶ 102). According to Ciminelli, Tri-Krete "was not issued an invitation through Textura to submit further payment applications" due to Tri-Krete's "continued defaults, its failure to provide requested information, the unapproved status [of App 12 and App 13], and Pike's resulting damages." (Dkt. 34-1 at ¶ 16). DeCarlo also avers that "Pike has no record of ever having received" invoices 8880, 8893, 8894, 8915, or 8916 in 2017, and that, in any event, "these invoices were not the form of payment application used on the Project, do not include all of the necessary documentation to establish Tri-Krete's entitlement to payment, and do not constitute proper payment applications under the terms of the Subcontract." (Dkt. 9-2 at ¶ 17).

Between May 9, 2017, and September 12, 2017, Tri-Krete submitted approximately 20 requests for contract revisions to Pike, asking for Pike to issue a "change order" modifying the Subcontract due to additional work completed by Tri-Krete. (*See* Dkt. 29-1 at 8-20). During this period, Tri-Krete received a letter from Pike, dated August 25, 2017, which denied contract revision numbers 005, 006, 007, 008, 010, and 018 (as it pertained to "Credit for UCP/Slaw Panels"). (Dkt. 32-17; *see* Dkt. 29-1 at ¶ 48). According to Bombini, Tri-Krete received no other correspondence rejecting any of the requests for contract revisions. (*See* Dkt. 29-1 at ¶ 101). It also appears that Tri-Krete

memorialized its request for these contract revisions in a single invoiced submission, dated December 7, 2017, and identified as invoice number 8946. (Dkt. 32-34; *see* Dkt. 29-1 at ¶ 98). On behalf of Pike, DeCarlo contends that these contract revisions "are unapproved change order requests and claims that have been denied by Pike as untimely, unsupported and barred by the terms of the Subcontract," and these claims "do not constitute proper and approved payment applications under Tri-Krete's Subcontract." (Dkt. 9-2 at ¶¶ 19-20; *see also* Dkt. 34-1 at (Cimminelli averring that by December 7, 2017, "Tri-Krete was well aware . . . that [Pike] had rejected, expressly or by the terms of the [S]ubcontract, each of the requests for change order listed" in invoice number 8946)).

## PROCEDURAL HISTORY

On April 20, 2018, Pike commenced this action alleging breach of the parties' Subcontract. (Dkt. 1). By letter dated May 8, 2018, Tri-Krete notified Pike of various alleged violations of the PPA. (Dkt. 7-5). Tri-Krete asserted, among other things, that Pike had "unreasonably withheld approval" of App 12, App 13, invoice numbers 8880, 8893, 8894, 8915, and 8916, and all requested contract revisions, and that Pike had "failed to give Tri-Krete a written notice of withholding specifying conditions for withholding payment and identifying the amount to be withheld." (*Id.* at 1). Tri-Krete also expressed its intention to refer the matter to the American Arbitration Association ("AAA") for expedited arbitration if the parties could not resolve the purported violations within 15 days of Pike's receipt of the letter. (*Id.* at 1-2). Tri-Krete filed a Demand for Arbitration with the AAA on June 11, 2018, and notified Pike the next day. (Dkt. 7-6).

On June 25, 2018, Tri-Krete filed its Answer in this action, denying all material allegations in the Complaint, setting forth various affirmative defenses, and asserting several counterclaims against Pike, which included causes of action for breach of contract, unjust enrichment, and violation of the PPA. (Dkt. 5). On the same day, Tri-Krete filed the pending motion to stay this action and to compel arbitration of its PPA claims. (Dkt. 7). On July 7, 2018, Pike filed the pending motion to stay arbitration (Dkt. 9), arguing that the PPA's arbitration provision did not apply to Tri-Krete's claims (Dkt. 9-1). On August 29, 2018, Pike filed a motion for a preliminary injunction, requesting that the Court enjoin any further arbitration proceedings. (Dkt. 22). Each party opposed the other's respective motions. (*See* Dkt. 14; Dkt. 15; Dkt. 25).

On September 19, 2018, the Court heard oral argument. (Dkt. 27; Dkt. 28). The Court requested further submissions; Tri-Krete filed an affidavit with additional exhibit submissions on October 2, 2018 (Dkt. 29; Dkt. 32; Dkt. 33), and Pike filed two responsive affidavits and associated exhibits on October 15, 2018 (Dkt. 34). A telephone status conference was held on October 17, 2018 (Dkt. 37), and on October 25, 2018, Pike filed a further affidavit and letter (Dkt. 38).

## DISCUSSION

### I.   Pike's Motion for a Preliminary Injunction

#### A.   Legal Standard

In order to obtain a preliminary injunction, the moving party must establish the following: (1) a likelihood of irreparable harm absent preliminary relief; (2) a likelihood of success on the merits; (3) the balance of equities tipping in favor of the moving party;

and (4) the public interest is served by an injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the moving party is unable to demonstrate a likelihood of success on the merits, a court may still issue a preliminary injunction if the moving party demonstrates "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)).

### B.    Irreparable Harm

The most important prerequisite to issuing a preliminary injunction is irreparable harm. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Plaintiffs seeking preliminary injunctive relief must affirmatively "demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). "The movant is required to establish not a mere possibility of irreparable harm, but that it is 'likely to suffer irreparable harm if equitable relief is denied.'" *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 531 (S.D.N.Y. 2004) (quoting *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990)).

## C. Likelihood of Success on the Merits

"The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits. A mandatory injunction, in contrast, is said to alter the status quo by commanding some positive act." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). In such circumstances, "the moving party must show a 'clear' or 'substantial' likelihood of success." *Beal v. Stern*, 184 F.3d 117, 123 (2d Cir. 1999) (citation omitted). Moreover, the grant of preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

## D. Pike's Motion for a Preliminary Injunction Hinges Upon the Arbitrability of Tri-Krete's Claims

Pike argues that "[c]ourts often find irreparable harm where the moving party is seeking to stay an imminent arbitration where the arbitrability of the dispute is in question." (Dkt. 22-3 at 3). Pike finds support for this proposition in *Md. Casualty Co. v. Realty Advisory Bd. On Labor Relations*, 107 F.3d 979 (2d Cir. 1997), which held that a party resisting arbitration "would be irreparably harmed by being forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable." *Id.* at 985. The Second Circuit has continuously adhered to this holding in more recent cases. *See UBS Sec., LLC v. Voegeli*, 405 F. App'x 550, 552 (2d Cir. 2011) ("Being forced to arbitrate a claim one did not agree to arbitrate constitutes an irreparable

harm for which there is no adequate remedy at law."); *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) (affirming the district court's finding of irreparable harm and its reliance upon *Maryland Casualty*, stating that in *Maryland Casualty*, the court "affirmed a preliminary injunction granted in favor of a party resisting arbitration on the ground that the dispute was outside the arbitration agreement").

In opposition, Tri-Krete relies upon *Emery Air Freight Corp. v. Local Union 295*, 786 F.2d 93 (2d Cir. 1986), which held that "arbitration by itself imposes no such [irreparable] injury to the resisting party, except perhaps in 'extraordinarily rare' circumstances. . . ." *Id.* at 100; *see also id.* ("The monetary cost of arbitration certainly does not impose such legally recognized irreparable harm." (citing *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."))). A close review of *Emery Air* and *Maryland Casualty* reveals that the Second Circuit arrived at a different outcome in each case based upon the arbitrability of the claims at issue. In other words, these cases stand for the proposition that irreparable harm exists when a party is forced to arbitrate a dispute that is not subject to arbitration, but no irreparable harm arises from arbitrating disputes that are subject to arbitration.

In both *Emery Air* and *Maryland Casualty*, the Second Circuit first analyzed whether the relevant claims were arbitrable. In *Maryland Casualty*, the court determined that the claims were not arbitrable. 107 F.3d at 984 ("[T]he district court did not err in concluding that the present dispute was not arbitrable as a result of the six Partners's employees not being covered by the Agreement."); *see Int'l Bhd. of Elec. Workers, AFL-*

*CIO, Local Union No. 3 v. Charter Commc'ns, Inc.*, 277 F. Supp. 3d 356, 364 (E.D.N.Y. 2017) (stating that the *Maryland Casualty* "court found that the dispute was not subject to arbitration because the aggrieved employees pressing for arbitration were not covered by the parties' collective bargaining agreement"); *see also Pictet Funds (Eur.) S.A. v. Emerging Managers Grp., L.P.*, No. 14-CV-6854 (SAS), 2014 WL 6766011, at *9 (S.D.N.Y. Dec. 1, 2014) ("In the context of arbitration, it is generally held that a party suffers irreparable harm when it is 'forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable.' A similar principle applies to the hardship prong. Here, plaintiffs both foreign entities *did not agree to arbitrate the Claim*, and I find that these two factors are satisfied." (footnotes omitted) (emphasis added)); *cf. Vittoria Corp. v. N.Y. Hotel & Motel Trades Council, AFL-CIO*, 30 F. Supp. 2d 431, 437-38 (S.D.N.Y. 1998) (distinguishing *Maryland Casualty* since, "[i]n that case, the issue was clearly not arbitrable because the arbitration clause expressly excluded the parties being compelled to arbitrate," and concluding that the movant failed to establish irreparable harm). Thus, *Maryland Casualty* stands for the proposition that forcing a party to arbitrate non-arbitrable issues results in irreparable harm.

By comparison, the *Emery Air* court first determined that the issues were arbitrable. 786 F.2d at 99; *see Int'l Bhd. of Elec. Workers*, 277 F. Supp. 3d at 364 (stating that the *Emery Air* court, "after deciding the disputes were arbitrable, rejected the employer's bid for a preliminary injunction staying arbitration"); *see also Lawrence v. Wilder Richman Sec. Corp.*, 417 F. App'x 11, 14 (2d Cir. 2010) ("While Lawrence cites a number of cases for the proposition that 'a party does suffer irreparable harm when forced to arbitrate a

dispute which that party has not agreed to arbitrate,' he ignores the fact that he expressly agreed to arbitrate disputes with Wilder Richman. A party suffers no legally cognizable injury at all, let alone irreparable injury, by being compelled to engage in arbitration to which he has contractually agreed." (citation omitted)); *Starr v. Firstmark Corp.*, No. CV-12-4023 (SJF) (AKT), 2012 WL 4891622, at *8 (E.D.N.Y. Oct. 12, 2012) (same); *cf. Morgan Stanley & Co. v. Seghers*, No. 10 CIV. 5378 (DLC), 2010 WL 3952851, at *6 (S.D.N.Y. Oct. 8, 2010) (finding that arbitration "expenditures, especially where the arbitrability of the issues or the enforceability of any arbitration award is the subject of significant doubt, are an irreparable injury sufficient to support a preliminary injunction" (citing *Merrill Lynch Inv. Managers*, 337 F.3d at 129)). Accordingly, *Emery Air* stands for the corresponding proposition that no irreparable harm results from compelling the arbitration of arbitrable claims.

Consistent with *Emery Air* and *Maryland Casualty*, the Court will determine whether the parties' disputes are arbitrable before deciding whether irreparable harm exists. *See Int'l Bhd. of Elec. Workers*, 277 F. Supp. 3d at 365 (stating that in both *Emery Air* and *Maryland Casualty*, "the court addressed the merits of the petitioner's claim—the arbitrability of the dispute—before examining the irreparable injury prong"). If Tri-Krete's claims fall within the scope of the PPA's arbitration provision, then Pike's motion for a preliminary injunction must be denied because no irreparable harm would result from their continued arbitration before the AAA. *Emery Air*, 786 F.2d at 100. On the other hand, if Tri-Krete's claims are not arbitrable under the PPA, then requiring Pike to arbitrate non-arbitrable claims would result in irreparable harm, *Maryland Casualty*, 107 F.3d at 985,

and the other elements of Pike's motion for a preliminary injunction must then be evaluated.

Thus, the issue of arbitrability is central to the Court's disposition of each pending motion. Although Pike may not have formally agreed to arbitrate the alleged PPA violations, that fact is irrelevant where the parties are subject to a compulsory arbitration provision set forth in a state statute. However, the scope of the PPA's arbitration provision will influence the arbitrability of Tri-Krete's claims. Accordingly, the Court must first address the PPA's arbitration provision and the arbitrability of Tri-Krete's PPA claims before ruling upon Pike's motion for a preliminary injunction.

### E.     The Arbitrability of Tri-Krete's PPA Claims

#### 1.     The PPA's Requirements and Arbitration Remedy

The Court's research has revealed only a limited number of state and federal opinions interpreting the PPA, and virtually no case law describing the scope of the PPA's arbitration provision in any depth. As such, the Court begins its analysis with the statutory text.

The purpose of the PPA is "to expedite payment of all monies owed to those who perform contracting services pursuant to construction contracts." N.Y. Gen. Bus. Law § 756-a. The statute requires that "[u]pon delivery of an invoice and all contractually required documentation, a contractor or subcontractor shall approve or disapprove all or a portion of such invoice within twelve business days." *Id.* § 756-a(2)(a)(ii). A contractor's approval "shall not be unreasonably withheld nor shall a contractor[,] . . . in bad faith, disapprove all or a portion of an invoice." *Id.*

- 12 -

> The contractor['s] . . . payment of subcontractor or material supplier's interim or final invoice shall be made on the basis of a duly approved invoice of the work performed and materials supplied during the billing cycle.

*Id.* § 756-a(3)(b).

> Upon receipt of written notice of a complaint . . . that a contractor has violated the provisions of this article . . . [or] where a subcontractor alleges a contractor has violated the provisions of this article[,] . . . the parties shall attempt to resolve the matter giving rise to such complaint.

*Id.* § 756-b(3)(a).

If the parties cannot reach a mutually agreeable resolution, "the aggrieved party may refer the matter, not less than fifteen days of the receipt of third party verification of delivery of the complaint, to the American Arbitration Association for an expedited arbitration pursuant to the Rules of the American Arbitration Association." *Id.* § 756-b(3)(c). This statutorily-derived arbitration remedy was intended to promote "speedier resolutions," lessen the "time and funds wasted in litigation," and hasten the "payment of moneys owed." N.Y. Bill Jacket, 2009 A.B. 6493, Ch. 417.

### 2. The Subcontract's Dispute Resolution Clause

A preliminary issue that the Court must address is whether the Subcontract provides Pike with the option of avoiding the PPA's arbitration requirements. Pike argues that the dispute resolution process set forth in the parties' Subcontract provides Pike with "the right to reject arbitration and to commence litigation if it chose to do so." (Dkt. 26 at 11). The Subcontract expressly provides Pike with the option of accepting or rejecting any demand for arbitration for "[a]ll claims, disputes and other matters in question between [Tri-Krete] and [Pike] arising out of or related to the Subcontract. . . ." (Dkt. 11 at 60-61; *see id.* ("If

- 13 -

a demand for arbitration is filed by [Tri-Krete], [Pike] shall advise [Tri-Krete], within thirty (30) days after the receipt of such a demand for arbitration, if [Pike] exercises the option to arbitrate or rejects arbitration; such election, once made, shall be binding.")). Thus, Pike contends that the contract language provides it with the option of litigating any dispute with Tri-Krete and avoiding arbitration.

In support of its position, Pike relies upon *Turner Constr. Co. v. J & A Concrete Corp.*, 44 Misc. 3d 217 (Sup. Ct., N.Y. County 2014). (Dkt. 26 at 11). In *Turner*, the court addressed whether the respondent was "entitled to refer the underlying dispute to arbitration under [the] PPA" pursuant to the terms of the subcontract at issue in that case. 44 Misc. 3d at 225. That subcontract contained a dispute resolution clause, granting the petitioner the sole option of determining "the manner and forum" to resolve the dispute "under the terms of the General Contract or according to law." *Id.* (quotation marks and emphasis omitted). Relying on the contract language and the principle that a contract is to be construed so as to give effect to each and every part thereof, the *Turner* court concluded that the petitioner could avoid arbitration under the PPA and resolve any disputes through litigation. *See id.* at 225-26.

The *Turner* court's reasoning is fundamentally flawed because it failed to address § 757 of the PPA. Section 757 voids any "provision, covenant, clause or understanding in, collateral to or affecting a construction contract stating that expedited arbitration as expressly provided for and in the manner established by section seven hundred fifty-six-b of this article is unavailable to one or both parties." N.Y. Gen. Bus. Law § 757(3). Because the PPA renders as unenforceable any contract provision that makes the PPA's expedited

arbitration provision "unavailable to one or both parties," the *Turner* court overlooked § 757 in evaluating a subcontract provision that granted one party the sole option of determining the manner and forum of dispute resolution.

By contrast, the Third Department's subsequent decision in the case of *In re Arbitration between Capital Siding & Constr., LLC*, 138 A.D.3d 1265 (3d Dep't 2016), *leave to appeal denied sub nom. Capital Siding & Constr., LLC v. Alltek Energy Sys., Inc.*, 27 N.Y.3d 911 (2016), aptly illustrates the applicability of § 757 in this context. In *Capital Siding*, the petitioner contended that the subcontract's dispute resolution provision superseded the PPA's requirement that expedited arbitration be available to an aggrieved party. *Id.* at 1266. Relying on § 757 of the PPA, the Third Department rejected this argument and determined that the subcontract section identifying litigation as the parties' chosen method of dispute resolution was void and unenforceable. *Id.*

Here, the dispute resolution procedure set forth in Section 11.9 of the Subcontract empowers Pike with the sole authority to elect whether to proceed with arbitration or litigation. (*See* Dkt. 11 at 60-61). Pike argues that *Capital Siding* is distinguishable because the provision at issue in that case mandated that any dispute related to the parties' agreement be resolved through litigation in *all* circumstances, whereas the instant provision permits Tri-Krete to demand arbitration and only vests Pike with the authority to elect or decline to proceed to arbitration. (*See* Dkt. 26 at 11 (arguing that the Subcontract merely provides "for the progression of disputes through mediation and then arbitration if Pike decides to proceed with arbitration," and it grants Pike "the right to reject arbitration and to commence litigation if it chose to do so")). According to Pike, "there is nothing in the

- 15 -

controlling Subcontract or Prime Contract that states that expedited arbitration under the Prompt Payment Act is unavailable to either party, or that would prevent Tri-Krete from demanding arbitration under the Prompt Payment Act had it satisfied the threshold requirements to demand expedited arbitration." (*Id.*).

However, § 757 prohibits any contractual provision that causes the PPA's expedited arbitration remedy to become "unavailable to *one or both parties*." N.Y. Gen. Bus. Law § 757(3) (emphasis added). The effect of Section 11.9 of the Subcontract is to make arbitration unavailable to Tri-Krete *unless* Pike elects to proceed with arbitration, regardless of whether Tri-Krete would otherwise be entitled to arbitration under the PPA. In other words, Pike may reject any arbitration demand arising out of a dispute related to the Subcontract at its sole discretion, effectively depriving Tri-Krete of its right to expedited arbitration for any alleged PPA violations.

As a result, insofar as Pike argues that the arbitration remedy is unavailable to Tri-Krete because of the Subcontract's dispute resolution clause, that clause is rendered void and unenforceable pursuant to § 757(3) of the PPA. Accordingly, the arbitration remedy set forth in § 756-b(3) of the PPA remains available to Tri-Krete for any alleged violation of the PPA.

### 3. The Scope of the PPA's Arbitration Provision

Having determined that Tri-Krete may invoke the PPA's arbitration procedures, the next issue becomes the scope of any such arbitration. The plain language of the PPA reveals its arbitration provision was broadly drafted in favor of arbitrability. Subsection three of § 756-b sets forth the PPA's arbitration remedy, *see* N.Y. Gen. Bus. Law § 756-

b(3), and is intended to "effectuate[]" the purpose of the statute, *see Capital Siding*, 138 A.D.3d at 1266. That provision, as noted above, requires informal dispute resolution negotiations to take place after the contractor receives "written notice of a complaint" that it "has violated the provisions of this article," or "where a subcontractor *alleges* [that the] . . . contractor has violated the provisions of this article." N.Y. Gen. Bus. Law § 756-b(3)(a) (emphasis added). The PPA further provides that if the parties fail to reach a mutually agreeable resolution through informal avenues, "the aggrieved party may refer the matter, not less than fifteen days of the receipt of third party verification of delivery of the complaint, to the American Arbitration Association for an expedited arbitration pursuant to the Rules of the American Arbitration Association." *Id.* § 756-b(3)(c).

Section 756-b(3) clearly outlines the necessary prerequisites that must be satisfied before seeking the benefit of the PPA's arbitration remedy. While there is little caselaw specifically interpreting this arbitration provision, the available decisional law supports the conclusion that a claim alleging a violation of the PPA is subject to arbitration so long as the prerequisites of § 756-b(3) have been satisfied.

In *Capital Sidings*, the court determined that the PPA's arbitration remedy may be raised when "a contractor *is accused* of violating any of the PPA's provisions." 138 A.D.3d at 1266 (emphasis added). This language supports the notion that the PPA's arbitration provision is intended to be broadly construed to carry out the intent of the state legislature: So long as the subcontractor plausibly alleges that the PPA has been violated, the question of whether there has actually been a violation is an issue for the arbitrator to determine. *See generally Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (rejecting the

position that "any potentially dispositive gateway question" should be considered "a 'question of arbitrability,'" and stating that "the phrase 'question of arbitrability' has a far more limited scope").

Federal and state courts agree that "a defendant that did not respond to an invoice within the allotted twelve days" is not precluded from raising affirmative defenses or "present[ing] evidence that the invoiced amount was 'subject to various deductions for, inter alia, back charges, incorrect invoicing, and improper performance of the work.'" *Layout, Inc. v. Heavy Metal Corp.*, No. 16-CV-2531, 2018 WL 2244684, at *3 (E.D.N.Y. Apr. 17, 2018) (quoting *Donninger Constr., Inc. v. C.W. Brown, Inc.*, 113 A.D.3d 724, 725 (2d Dep't 2014)). Indeed, "nothing in General Business Law § 756-b provides that a contractor's failure to timely disapprove or make payment on an invoice prevents the contractor from contesting, acts as a waiver of a contractor's ability to contest, or constitutes an admission that the contractor owes the invoiced sum." *Donninger Constr., Inc.*, 113 A.D.3d at 725. These issues are viewed as defenses to payments sought by the subcontractor. *Id.*; *see Precast Restoration Servs., LLC v. Glob. Precast, Inc.*, 131 A.D.3d 873, 874 (1st Dep't 2015) (denying summary judgment because, *inter alia*, "an issue of fact exists as to whether plaintiff failed to submit 'contractually required documentation' with the invoices, thereby excusing defendant of its obligation to approve or disapprove the invoices within 12 business days"). While much of this caselaw arises from motion practice upon the merits of an action rather than an arbitration dispute, the Court fails to see how such defenses would be viewed with any less relevance before a panel of

arbitrators.[2] In other words, if a subcontractor alleges that the PPA was violated and satisfies the prerequisites of § 756-b(3), then the claim may proceed to arbitration where the contractor may raise any applicable defense to support its non-payment. *See Enters. Ass'n Metal Trades Branch Local Union 638, AFL-CIO v. Empire Mech., Inc.*, No. 91 CIV. 5014 (CSH), 1992 WL 84689, at *2 (S.D.N.Y. Apr. 9, 1992) ("Affirmative defenses affecting the merits of an arbitrable claim are decided by arbitrators, not the courts."); *Putnam Mills Corp. v. So-Sew Styles, Inc.*, No. 84 CIV. 8080 (SWK), 1985 WL 3378, at *1 (S.D.N.Y. Oct. 25, 1985) ("Once a federal court is satisfied that the issue is arbitrable, all other issues, including the defenses to and ultimate merits of the claim, are reserved for the arbitrator."); *see generally Howsam*, 537 U.S. at 84 ("[T]he presumption is that the arbitrator should decide 'allegation[s] of waiver, delay, or a like defense to arbitrability.'").

In other words, Pike's arguments against the applicability of the PPA raise various potential defenses to the alleged PPA violations and are thus, entwined with the merits of Tri-Krete's PPA claims. *See generally Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Belco Petroleum Corp.*, 88 F.3d 129, 135-36 (2d Cir. 1996) (finding a "claim of [issue] preclusion" to be "a legal defense" that is "as much related to the merits" as several other affirmative defenses, "which are assigned to an arbitrator under a broad arbitration clause"); *McAllister Bros. v. A & S Transp. Co.*, 621 F.2d 519, 523 (2d Cir. 1980) (finding that the adjudication of the defense of abandonment should take place in arbitration because

---

[2]     Of note, the issue of arbitrability was not raised in these cases. Indeed, the PPA's arbitration provision need not be invoked in all instances, but rather "the aggrieved party *may* refer the matter" for expedited arbitration at its election. N.Y. Gen. Bus. Law § 756-b(3)(c) (emphasis added).

it is "inextricably tied up with the merits of the underlying dispute," and is thus, "wholly derivative of issues that fall within the scope of the arbitration clause"). For example, whether or not Tri-Krete's requested contract revisions should be considered "invoices" for purposes of the PPA is a merits-based question critical to determining whether there *has been* a violation of the statute, and thus, is the sort of issue to be decided in arbitration. Similarly, whether Tri-Krete submitted all "contractually required documentation" with its payment requests, and whether those requests were properly received, raise further potential defenses to any obligation Pike had to respond to those "invoices" within 12 business days. *See Layout, Inc.*, 2018 WL 2244684, at \*3; *Precast Restoration Servs., LLC*, 131 A.D.3d at 874; *Donninger Constr., Inc.*, 113 A.D.3d at 725. As such, they too strike at the heart of whether a violation of the PPA occurred. As the plain language of the PPA makes clear, the dispute resolution provisions are triggered by the mere *allegation* that the contractor has violated the statute, and thus, whether it has actually done so is a question best left to arbitration. *See* N.Y. Gen. Bus. Law § 756-b(3); *Capital Siding*, 138 A.D.3d at 1266.

Indeed, if every time a demand for arbitration is made—in full satisfaction of the prerequisites for arbitration under § 756-b(3)—the resisting party may invoke substantive questions challenging the merits of the alleged violation before any arbitration may proceed, the laudatory objectives of the PPA, including "speedier resolutions" and reduced "time and funds wasted in litigation," would be undermined. *See* N.Y. Bill Jacket, 2009 A.B. 6493, Ch. 417. Furthermore, an extensive analysis by a court of whether the PPA has been violated, and any related affirmative defenses, would leave very little for an

arbitration panel to resolve. It is doubtful that the state legislature contemplated that the AAA would play so minimal a role in resolving alleged PPA violations when the aggrieved party demands expedited arbitration.

In sum, the material question before this Court is whether the prerequisites of § 756-b(3) have been satisfied. Pike does not dispute receipt of Tri-Krete's May 8, 2018, letter (Dkt. 9-2 at ¶ 7), which outlines various alleged PPA violations, including that Pike "unreasonably withheld approval" of App 12, App 13, invoices 8880, 8893, 8894, 8915, and 8916, and the requested contract revisions numbered one through twenty (Dkt. 7-5); *see also* N.Y. Gen. Bus. Law § 756-b(3)(b) ("The written notice required under this section shall be delivered at or sent by any means that provides written, third-party verification of delivery to the last business address known to the party giving notice."). Tri-Krete also notified Pike that the parties were "obliged to attempt to resolve the above-referenced violations," and requested that Pike or its attorneys contact Tri-Krete and/or its attorneys. (Dkt. 7-5 at 1). Tri-Krete further indicated that it intended to refer the matter to the AAA for expedited arbitration if the parties were unable to resolve the matter within 15 days from the date Pike received the letter. (*Id.* at 2). There is no question that the disputes were not resolved and Tri-Krete referred its alleged PPA violations to the AAA "not less than fifteen days of the receipt of third party verification of delivery of the complaint." N.Y. Gen. Bus. Law § 756-b(3)(c); (*see* Dkt. 7-6; Dkt. 9-2 at ¶ 21).

Therefore, Tri-Krete complied with the prerequisites of § 756-b(3) and any PPA violation alleged in the May 8, 2018, letter is properly before the AAA and should proceed to conclusion in the pending arbitration. Accordingly, Pike's motion for a preliminary

injunction (Dkt. 22) is denied on the ground that the alleged PPA violations are arbitrable before the AAA panel, and thus, Pike has not demonstrated that irreparable harm will result from compelling continued arbitration proceedings. Furthermore, to the extent Tri-Krete's motion to compel arbitration seeks to arbitrate the alleged PPA violations now pending before the AAA (Dkt. 7), its motion is granted, and Pike's competing motion to stay that arbitration (Dkt. 9) is denied. Importantly, the Court's conclusion should not be interpreted as endorsing Tri-Krete's position that it is entitled to payment of any of the amounts asserted as due from Pike. As discussed in further detail below, the merits of Tri-Krete's claims and Pike's defenses to those claims must be evaluated, at least in the first instance, through arbitration.

### 4. Issues Not Subject to Arbitration

The Court pauses to emphasize that the *only* arbitrable claims—and the only claims referred to arbitration—are the alleged PPA violations set forth in the May 8, 2018, letter and encompassed by Tri-Krete's fourth counterclaim. (*See* Dkt. 5 at 6-7; Dkt. 7-5). To be sure, Tri-Krete's counterclaims for breach of contract, unjust enrichment, and unpaid labor and materials seek similar, if not identical, monetary relief as that which is sought by its fourth counterclaim. (*See* Dkt. 5 at 4-8). However, Tri-Krete's first, second, and third counterclaims are not subject to resolution in arbitration, as the AAA's authority to issue an arbitral award is limited to the "alleged violation" of the PPA. *See* N.Y. Gen. Bus. Law § 756-b(3)(d) ("Upon conclusion of the arbitration proceedings, the arbitrator shall submit to the parties his or her opinion and award regarding the alleged violation."). The merits of those remaining counterclaims must instead be resolved through litigation.

Pike's breach of contract cause of action is also not arbitrable. While Pike may argue to the AAA panel that Tri-Krete's purported breaches of the Subcontract represent defenses to its obligations under the PPA, the arbitral opinion and award should be based upon Pike's compliance or non-compliance with the PPA. In other words, the AAA panel is without jurisdiction to determine whether Pike has asserted a meritorious common law cause of action for breach of contract. This is so even if the AAA panel finds it necessary to determine whether Tri-Krete materially breached the Subcontract in order to resolve the alleged PPA violations.[3]

## II.    This Action Will be Stayed Pending Arbitration

Having determined that some, but not all, of the claims before this Court are subject to arbitration, the Court must now decide whether to stay the balance of this matter pending the resolution of the arbitration. *See JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004) ("[I]f the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration." (citation omitted)). "In deciding this issue, a court should bear in mind that if the nonarbitrable claims are stayed pending arbitration of a [claimant']s other claims, then

---

[3]    While it remains unclear exactly what issues will be resolved through arbitration, the Court notes that whatever arguments the parties choose to raise and litigate during those proceedings may form the basis for the assertion of collateral estoppel in subsequent litigation or arbitration. *See Bear, Stearns & Co. Inc. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005) ("An arbitration decision may effect collateral estoppel in a later litigation or arbitration if the proponent can show 'with clarity and certainty' that the same issues were resolved." (quoting *Postlewaite v. McGraw-Hill, Inc.*, 333 F.3d 42, 49 (2d Cir. 2003))). In other words, while the AAA may be without jurisdiction to resolve any claims other than the PPA claims, its factual findings may be relevant to a resolution of the non-arbitrable claims.

the [claimant] may wait 'months, if not years, before [her] nonarbitrable claims will be heard by a federal court.'" *Klein v. ATP Flight Sch., LLP*, No. 14-CV-1522 (JFB) (GRB), 2014 WL 3013294, at *11 (E.D.N.Y. July 3, 2014) (quoting *Chang v. Lin*, 824 F.2d 219, 222 (2d Cir. 1987)).

Accordingly, "[t]he party seeking a stay must first demonstrate that 'there are issues common to the arbitration and the court proceeding,' and then show that 'those issues will be finally determined by arbitration.'" *In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 499 (S.D.N.Y. 2013) (quoting *Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.*, 885 F. Supp. 499, 502 (S.D.N.Y. 1995)). If the moving party can carry this initial burden, it must then satisfy the following elements: "(1) that a stay will not 'hamper the progress of the proceeding,'; (2) that the arbitration 'is expected to conclude within a reasonable time,'; and (3) that the stay will not impose an 'undue hardship' on the non-moving party." *Id.* (quoting *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991)). "Ultimately, however, '[t]he decision whether to stay nonarbitrable claims pending arbitration is largely within the discretion of the trial court.'" *Champion Auto Sales, LLC v. Polaris Sales Inc.*, 943 F. Supp. 2d 346, 355 (E.D.N.Y. 2013) (quoting *Acquaire v. Can. Dry Bottling*, 906 F. Supp. 819, 838 (E.D.N.Y. 1995)); *see Senisi v. John Wiley & Sons, Inc.*, No. 13CV3314-LTS-AJP, 2015 WL 256094, at *6 (S.D.N.Y. Jan. 21, 2015) ("The decision to grant a stay falls within the discretion of the trial court as a means of controlling its docket."); *Kouromihelakis v. Hartford Fire Ins. Co.*, 48 F. Supp. 3d 175, 185 (D. Conn. 2014) ("The decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket.").

"A discretionary stay is particularly appropriate where there is significant factual overlap between the remaining claims and the arbitrated claims." *Winter Inv'rs, LLC v. Panzer*, No. 14 Civ. 6852 (KPF), 2015 WL 5052563, at *11 (S.D.N.Y. Aug. 27, 2015); *see Moore v. Interacciones Glob., Inc.*, No. 94 CIV. 4789 (RWS), 1995 WL 33650, at *7 (S.D.N.Y. Jan. 27, 1995) ("It is well-settled that claims are appropriately stayed when they involve common issues of fact and law with those subject to arbitration or when the arbitration is likely to dispose of issues common to claims against both arbitrating and non-arbitrating defendants."). "In such cases, a stay is warranted in part because the prior litigation or arbitration is likely to have preclusive effect over some or all of the claims not subject to arbitration." *Winter Inv'rs, LLC*, 2015 WL 5052563, at *11 (citing *Bear, Stearns & Co.*, 409 F.3d at 91). A stay may also be justified even where the arbitral proceedings are not necessarily "controlling of the action before the court." *See Maritima de Ecologia, S.A. de C.V. v. Sealion Shipping Ltd.*, No. 10 Civ. 8134 (DLC), 2011 WL 1465744, at *5 (S.D.N.Y. Apr. 15, 2011) (quotation marks omitted).

Aside from arguing, in general, that a stay of this action would be in the interests of judicial economy (*see* Dkt. 7-2 at 7-8), Tri-Krete offers little reason for this Court to find a stay to be justified. Nonetheless, in the exercise of its discretion, the Court will stay this action for the following reasons. *See Cosmotek Mumessillik Ve Ticaret Ltd. Sirkketi v. Cosmotek USA, Inc.*, 942 F. Supp. 757, 761 (D. Conn. 1996) (granting a stay even though the defendants' "heavy burden . . . to show the necessity for the stay has not clearly been met" (citation omitted)).

Pike's Complaint alleges a breach of contract cause of action arising from Tri-Krete's alleged default and breach of the Subcontract. (Dkt. 1). Whether Tri-Krete has breached the Subcontract raises an issue that is "common to the arbitration and the court proceeding" because Pike has raised this issue as a defense to its obligations under the PPA. (*See, e.g.*, Dkt. 9-1 at 7). Indeed, while the arbitration will not reach the merits of Pike's breach of contract claim, it may "finally determine" the factual issue of whether a breach of the Subcontract occurred in deciding whether Pike has a viable defense to the alleged PPA violations.

Tri-Krete has also asserted several counterclaims arising from Pike's alleged breaches of the Subcontract and alleged unjust enrichment derived from the labor and materials supplied by Tri-Krete. (Dkt. 5 at 4-6). The resolution of the alleged PPA violations may provide the Court with insight as to whether Pike failed to make payments owed to Tri-Krete pursuant to the billing cycle established under the Subcontract, and as such, could have significant bearing on at least some of Tri-Krete's non-arbitrable allegations. *See Hikers Indus., Inc. v. William Stuart Indus. (Far E.) Ltd.*, 640 F. Supp. 175, 178 (S.D.N.Y. 1986) (staying the action where "the arbitration will provide the court with insight into the issues of law and fact"); *see also Maritima de Ecologia, S.A. de C.V.*, 2011 WL 1465744, at *5 (staying the action where the arbitration proceedings would "have a significant bearing on th[e] case"); *see generally* N.Y. Gen. Bus. Law § 756-a(1) ("The parties to a construction contract may, by mutual agreement, establish a billing cycle for the submission of invoices requesting payment for work performed pursuant to a construction contract."). Furthermore, while Tri-Krete has not provided any indication as

to the expected duration of the arbitration proceedings, *see Donjon Marine Co. v. Water Quality Ins. Syndicate*, 523 F. App'x 738, 740 (2d Cir. 2013) (affirming the decision to decline to stay the litigation because the movant failed to demonstrate that "the arbitration would likely conclude within a reasonable time"), given the expedited nature of the arbitration at issue, the Court finds no reason to believe that those proceedings will not conclude within a reasonable time or that the stay of this matter will cause Pike any undue hardship, *see generally WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 76 (2d Cir. 1997) ("There is no allegation that . . . the arbitration will not be resolved within a reasonable amount of time."); *N.Y. Cross Harbor R.R. Terminal Corp. v. Consol. Rail Corp.*, 72 F. Supp. 2d 70, 81 (E.D.N.Y. 1998) ("One of the virtues of arbitration is its expedited format. As a result, there is no reason to believe that staying the breach of lease claims pending arbitration would cause the plaintiff undue hardship." (citation omitted)).

Accordingly, in light of the significant overlap among the issues to be decided in this action and those likely to be decided during arbitration, the Court concludes that a stay is appropriate. *See Catlin Syndicate 2003 v. Traditional Air Conditioning, Inc.*, No. 17-CV-2406 (JFB) (AYS), 2018 WL 3040375, at *8 (E.D.N.Y. June 18, 2018) ("[G]iven the significant overlap among plaintiff's claims, the Court concludes, in its discretion, that a stay is appropriate."); *Winter Inv'rs, LLC*, 2015 WL 5052563, at *12 (ordering a stay where "the issues that the arbitration panel will decide in resolving the Signatory Claims overlap significantly (if not entirely) with the issues that this Court would need to reach to adjudicate the Non–Signatory Claims"); *Mann v. N.A.S.A. Int'l, Inc.*, No. 99CIV.11936(AGS), 2000 WL 1182823, at *6 (S.D.N.Y. Aug. 21, 2000) ("As the

respective claims under each policy arise out of the same acts, arbitration of the claims related to the credit insurance policy will likely provide significant insight into the remaining nonarbitrable claims that will prove valuable in resolving them."); *see also BSG Res. (Guinea) Ltd. v. Soros*, No. 17 Civ. 2726 (JFK), 2017 WL 5897450, at *4 (S.D.N.Y. Nov. 29, 2017) ("Courts have granted stays where a pending arbitration was likely to determine the validity of the underlying contract and whether that contract was breached."); *see generally Louis Berger Grp., Inc. v. State Bank of India*, 802 F. Supp. 2d 482, 489 (S.D.N.Y. 2011) ("A stay is usually appropriate where arbitrable and non-arbitrable claims arise out of the same set of facts and arbitration may decide the same facts at issue in the litigation.").

In sum, the Court recognizes that the merits of the claims pending before it in this action have issues in common with the alleged PPA violations that must be resolved in arbitration. The significant overlap of these factual and legal issues warrants the issuance of a discretionary stay of this action.

## CONCLUSION

For the foregoing reasons, Tri-Krete's motion to stay this action and compel arbitration (Dkt. 7) is granted, Pike's motion to stay arbitration (Dkt. 9) is denied, and Pike's motion for a preliminary injunction (Dkt. 22) is denied. The parties shall notify the Court within 15 days of a final arbitration decision. The Clerk of Court is directed to stay this matter until further order of the Court.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:      November 20, 2018
            Rochester, New York