UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

THE PIKE COMPANY, INC.,

                     Plaintiff,

    v.

TRI-KRETE LIMITED,

                   Defendant.

───────────────────────────────

**DECISION AND ORDER**

6:18-CV-06311 EAW

## INTRODUCTION

Plaintiff The Pike Company ("Pike") commenced this action on April 20, 2018, against Defendant Tri-Krete Limited ("Tri-Krete") for breach of contract. (Dkt. 1). Tri-Krete thereafter asserted several counterclaims against Pike, including common law causes of action for breach of contract, unjust enrichment, nonpayment of invoices and statements of accounts, and violations of the New York Prompt Payment Act, N.Y. Gen. Bus. Law §§ 756 *et seq.* ("PPA"). (Dkt. 5 at 4-7). Pending before the Court are the parties' motions for partial summary judgment. (Dkt. 82; Dkt. 83). For the following reasons, Tri-Krete's motion (Dkt. 82) is granted in part and denied in part, and Pike's motion (Dkt. 83) is denied.

## BACKGROUND

Pike filed its complaint on April 20, 2018. (Dkt. 1). Tri-Krete filed an answer with counterclaims on June 25, 2018. (Dkt. 5). Contemporaneously with the filing of its answer, Tri-Krete filed a motion to stay the action and to compel arbitration (Dkt. 7), and Pike thereafter filed a motion to stay arbitration on July 2, 2018 (Dkt. 9). Pike filed an answer to Tri-Krete's counterclaims on July 16, 2018. (Dkt. 13).

On August 7, 2018, Pike filed a motion for a temporary restraining order (Dkt. 17), which it withdrew without prejudice on August 8, 2018 (Dkt. 20). Thereafter, Pike filed a motion for a preliminary injunction on August 29, 2018, as well as a motion to expedite. (Dkt. 22; Dkt. 23). On November 11, 2018, the Court issued a Decision and Order granting Tri-Krete's motion to stay the federal court action, denying Pike's motion to stay arbitration, and denying Pike's motion for a preliminary injunction, concluding that the alleged PPA violations encompassed by Tri-Krete's fourth counterclaim were arbitrable. (Dkt. 39). The Court directed the parties to provide status updates concerning the status of the arbitration. (Dkt. 40).

On November 16, 2020, Tri-Krete filed a motion to confirm the arbitration award (Dkt. 43), and on December 11, 2020, Pike filed a motion to stay enforcement of the arbitration award (Dkt. 46). On November 9, 2021, the Court issued a Decision and Order granting in part and denying in part the motion to confirm the arbitration award, to enter partial final judgment, and to lift the stay. (Dkt. 51). The case was referred to former United States Magistrate Judge Marian W. Payson for discovery. (Dkt. 52).

Pike and Tri-Krete filed motions for partial summary judgment on April 30, 2024. (Dkt. 82; Dkt. 83). The parties filed responses to the motions on May 28, 2024 (Dkt. 88; Dkt. 89), and replies were filed on June 11, 2024 (Dkt. 94; Dkt. 95).

## DISCUSSION

### I.    Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, it finds that no rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  "The moving party bears the burden of showing the absence of a genuine dispute as to any material fact[.]"  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014).  "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial."  *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).  Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."

*Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.    **Tri-Krete's Motion for Summary Judgment**

Tri-Krete moves for summary judgment on the following issues: (1) finding that Pike cannot recover "owner damages" totaling $2,700,000, which it identified as part of its December 15, 2021 Rule 26 disclosures, since Pike never incurred such damages; (2) finding that Pike cannot recover estimated costs in the amount of $300,000, for the completion of the Tri-Krete punch list work, since Pike never incurred such damages; (3) finding that Pike did not have a contractual obligation to complete Building D by August 31, 2017, and therefore precluding the introduction of time-related damages after that time; and (4) finding that Pike failed to mitigate its damages because it did not utilize a contingency of $2,683,759, to which it was contractually entitled. (Dkt. 82-1 at 7).

Pike concedes that Tri-Krete is entitled to summary judgment on the first two issues—that is, that Pike is not entitled to seek owner damages totaling $2,700,000, since Marist College, despite claiming these damages against Pike, did not pursue them, and also that Pike is not entitled to seek damages for punch list and non-conforming work, including because Pike's former Senior Project Manager, Gloria Ciminelli, testified that Pike's costs for this work were "nominal." (Dkt. 89 at 4). Accordingly, the Court grants Tri-Krete summary judgment on these two issues, and Pike will not be permitted to seek recovery of the $2,700,000 in owner damages, or the $300,000 in punch list work, at trial. The Court

- 4 -

examines the remaining two issues in turn.

## A. Relevant Facts

This case arose out of the construction of student dormitory buildings located at Marist College ("Marist"). (*See* Declaration of Adam Bombini, Vice President of Tri-Krete, in Support of Tri-Krete's Motion for Summary Judgment, Dkt. 82-3 ¶¶ 1, 3). The Project was divided into two phases: Phase 1, which consisted of Building A and Building B, and Phase 2, which consisted of Building C and Building D. (*Id.* at ¶ 3). Tri-Krete was a subcontractor on the project, and it was responsible for installing pre-cast concrete wall panels for Phase 2 of the project.[1] (*Id.* at ¶¶ 2, 9). The project architect was Robert A.M. Stern Architects, LLP ("RAMSA"). (*Id.* at ¶ 6). Pike was the general contractor for the project. (*Id.* at ¶ 7).

The agreement between Pike and Tri-Krete for Phase 2 of the project included an Exhibit AA Work Order ("Work Order"), and that Work Order was dated and executed on June 14, 2016. (Dkt. 82-2 at ¶ 1; Dkt. 89-9 at ¶ 1; *see also* Dkt. 82-13 (Work Order)). The total price for the Work Order was $7,027,005.00. (*See* Dkt. 82-3 at ¶ 5).

Although the work on the Marist project began in 2016 (Dkt. 82-2 at ¶ 3; Dkt. 89-9 at ¶ 3), Marist and Pike did not sign an owner contract for the Marist project until June 21, 2017 ("Owner Contract")—meaning that the Owner Contract was executed one year after

---

[1] In addition to the instant lawsuit it has brought against Tri-Krete, Pike also sued another pre-cast concrete wall manufacturer, Universal Concrete Products Corp., who was a subcontractor on Phase I of the Marist project. *See The Pike Co., Inc. v. Universal Concrete Products Corp. et al.*, 17-cv-06365 (W.D.N.Y. June 9, 2017). That case proceeded to trial before the undersigned in July 2022, and the jury returned a verdict for UCP. *See id.*, Dkt. 170.

Pike and Tri-Krete entered into the Work Order, and more than one year after the Project was underway (Dkt. 82-2 at ¶ 4; Dkt. 89-9 at ¶ 4). At the time the Owner Contract was executed, Pike agreed with Marist to complete the construction of Building C by August 24, 2017. (Dkt. 82-2 at ¶ 5; Dkt. 89-9 at ¶ 5). Also at the time the June 21, 2017 Owner Contract was executed, there was no agreed completion date for Building D, and the Owner Contract specified that the completion date for Building D was "TBD." (Dkt. 82-2 at ¶ 6; Dkt. 89-9 at ¶ 6). Pike contends that earlier project schedules had set forth building completion dates before August 24, 2017. (Dkt. 89-9 at ¶¶ 5-6). It is undisputed that the Owner Contract was never updated to include a completion date for Building D. (Dkt. 82-2 at ¶ 7; Dkt. 89-9 at ¶ 7).

According to Tri-Krete, "[u]nder Pike's stewardship, the Phase 2 project was plagued with problems from the very start." (Dkt. 82-3 at ¶ 10). Tri-Krete maintains that Pike failed to manage the subcontractors tasked with completing necessary work preceding Tri-Krete's work (*id*. at ¶ 11), including that subcontractors were late in obtaining building permits, pouring the foundation, erecting the structural steel, and installing precast plank installation, and that all these activities delayed Tri-Krete's start of the installation of the precast wall panels (*id*. at ¶¶ 12-16). Tri-Krete further maintains that its work was significantly delayed due to Pike's failure to facilitate timely approval of Tri-Krete's submittals to RAMSA, which in turn delayed the production of panels. (*Id*. at ¶ 17). Tri-Krete acknowledges that, "[w]hile Pike places blame for such delays on Tri-Krete, Tri-Krete vigorously disputes Pike's position." (*Id*.).

Building C was ultimately completed for student use for the 2017 Fall semester, and Building D was completed in December 2017. (Dkt. 82-2 at ¶¶ 30-31; Dkt. 89-9 at ¶¶ 30-31). Tri-Krete maintains that Pike had no obligation to complete Building D by a particular date. (Dkt. 82-2 at ¶ 32).

Tri-Krete maintains that, under the Owner Contract, time was only of the essence to the extent that a specific time limit was imposed in the contract documents. (Dkt. 82-2 at ¶ 8). Pike admits that Section 8.2.1 of the A201 General Conditions of the Contract for Construction provides: "Time limits stated in the Contract Documents are of the essence of the Contract" (*see* Dkt. 82-17 at 26 (AIA A201-2007 General Conditions of the Contract for Construction)), but denies Tri-Krete's assertion that "[u]nder the Owner Contract, time is only of the essence to the extent a time limit was imposed in the contract documents" (Dkt. 89-9 at ¶ 8).

Pursuant to Section 5.2.6 of the Owner Contract, "Exhibit F includes a contingency in the amount of $2,683,759.00." (Dkt. 82-2 at ¶ 11; Dkt. 89-9 at ¶ 11). Tri-Krete maintains that the contingency covered "unforeseen conditions and things that happen during the complex construction of a facility," and also that a portion of the contingency was to be used for accelerated and overtime costs, if incurred. (Dkt. 82-2 at ¶¶ 12-13). It is undisputed that Pike did not utilize the contingency. (Dkt. 82-2 at ¶ 14; Dkt. 89-9 at ¶ 14). Pike maintains that it did not use the contingency "because it was an element of a Guaranteed Maximum Price that was not agreed upon with the owner, Marist College." (Dkt. 89-9 at ¶ 14).

### B.  Preclusion of Time-Related Damages

Tri-Krete argues that because the Owner Contract did not require a completion date for Building D, Pike did not have a contractual obligation to complete Building D by August 31, 2017.  (Dkt. 82-1 at 21).  Accordingly, Pike should be precluded from seeking from Tri-Krete any time-related damages for delay arising after that date.  (*Id*.).  In support of its argument that Pike should be precluded from seeking time-related damages, Tri-Krete argues that it is undisputed that a firm completion date was not included in the contract documents, and therefore time was not "of the essence," *i.e.*, it was not an essential element of the contract.  (*Id*. at 21-22).  Tri-Krete points to testimony by Pike's President, Bill Tehan, that the Owner Contract between Pike and Marist did not provide a date for Pike to complete Building D—rather, that the date was "TBD."  (*See id*. at 22; *see also* Dkt. 82-8 at 4 (Tehan deposition testimony)).

In response, Pike does not dispute that it was not required to complete Building D by a particular date.  Rather, Pike argues that time was of the essence in other documents executed between Pike and Tri-Krete.  (Dkt. 89 at 8).  Pike points to both a Master Subcontract Agreement (MSA) which was dated and executed on October 2, 2015, and states at Section 3.1.1 that, "[t]ime is of the essence as to the prosecution of the Subcontract Work," as well as a declaration by Ms. Ciminelli, attaching a Guideline Construction Schedule setting forth a "desired must finish by" date of August 1, 2017.  (*Id*.; *see also* Dkt. 83-3 (Master Subcontract Agreement)).  Pike further argues that even if there were no such clause making time of the essence in any of the documents executed between Pike and Tri-Krete, one party may unilaterally make time of the essence by giving clear and

unequivocal notice that the contract must be performed within a reasonable time. (Dkt. 89 at 8).

"[W]hen a contract specifies a definite time for delivery . . . New York law requires the provisions specifying the date or dates for delivery to be strictly enforced in a contract action at law. In such an action, the parties are presumed to have agreed that time is of the essence." *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 269 (S.D.N.Y. 2002) (quotations and citation omitted). "However, if contrary intent affirmatively appears, time is not of the essence," and "[a] party may be deemed to have waived the right to timely performance, even where the parties have agreed that time is of the essence, by accepting performance after expiration of the time limit." *Franklin Pavkov Constr. Co. v. Ultra Roof, Inc.*, 51 F. Supp. 2d 204, 217 (N.D.N.Y. 1999). Further, "[e]ither party . . . may make or restore time as of the essence whenever it desires, simply by giving notice to that effect. The notice must be clear, distinct and unequivocal; fix a reasonable time within which to act; and inform the other party that failure to perform by that date will be considered a default." *Shipsview Corp. v. Beeche Sys. Corp.*, No. 94-CV-786, 1996 WL 590910, at *4 (N.D.N.Y. Oct. 10, 1996) (internal citation omitted), *aff'd*, 125 F.3d 844 (2d Cir. 1997).

The relevant contract documents at issue provided no definite time for completion of the work on Building D. It is undisputed that the Owner Contract executed on June 21, 2017, did <u>not</u> provide a completion date for Building D—rather, the date was "TBD" or "to be determined." It is also undisputed that the Owner Contract was never updated to provide for a firm completion date—which reflects an intent that time was *not* of the

essence, since if it was, presumably the parties would have ensured that a deadline was provided. Accordingly, Pike had no contractual obligation to complete Building D by August 31, 2017, and therefore there is no basis for Pike to pursue Tri-Krete for damages after that date.

Pike contends that time was of the essence in the subcontract between Pike and Tri-Krete, pointing to language in the MSA, as well as the Guideline Construction Schedule setting forth a desired must finish by date of August 1, 2017. As to the MSA, Section 3.1.1 of that document states: "Time is of the essence as to the prosecution of the Subcontract Work." (*See* Dkt. 83-3 at 10 (Master Subcontract Agreement)). But the MSA was executed on October 2, 2015—well before the Owner Agreement was executed on June 21, 2017, and as explained above, it is undisputed that the Owner Agreement did not provide for a completion date for Building D. In other words, the failure to provide a completion date for Building D constitutes a contrary intent to what was previously expressed in the MSA, and Pike could not incur damages when there was no final completion date provided and it had no obligation to finish construction on Building D by August 31, 2017.

As to the Initial Guideline Construction Schedule, that document was attached to the Work Order, and included "DESIRED MUST FINISH BY" dates for completion of all work on Phase 2, including that by providing for an August 1, 2017 completion date for Buildings C and D. (*See* Dkt. 83-4 at 26 (Guideline Construction Schedule)). That said, the dates for the completion of the project provided in this document continued to change before Tri-Krete commenced work (*see, e.g.*, Dkt. 88-2 (declaration of Adam Bombini, in Opposition to Pike's Motion for Summary Judgment)), and the Work Order itself between

Pike and Tri-Krete did not provide a definite time for performance. Further, the inclusion of a "desired must finish by" date does not necessarily make "time of the essence." *See, e.g.*, *Whitney v. Perry*, 208 A.D.2d 1025, 1025-26 (3d Dep't 1994) (finding that the agreement language of "in no event later than" was insufficient to make time of the essence); *see also ADC Orange, Inc. v. Coyote Acres, Inc.*, 7 N.Y.3d 484, 489 (2006) ("the mere designation of a particular date upon which a thing is to be done does not result in making that date the essence of the contract," and holding that the phrase "in no event later than," is insufficient to make time of the essence). Pike's assertion that the Guideline Construction Schedule included a desired completion date, standing alone, is insufficient to create a material issue of fact.

Pike also argues that even if the Subcontract did not include a time of the essence clause, it could have unilaterally made time of the essence "by giving clear and unequivocal notice that the contract must be performed within a certain reasonable time." (Dkt. 89 at 9). But the record before the Court does not support that Pike gave "clear and unequivocal notice"—rather, as referenced above, the record before the Court demonstrates that Pike changed the dates for the completion of the wall panel installation. (*See, e.g.*, Dkt. 88-2 at ¶¶ 14-17, 19, 40-41). Mr. Bombini explained that the initial dates for wall panel installation on Building C and Building D were in October and November 2016, respectively, but by September 2016, "that schedule had slipped significantly," and new dates of December 7, 2016, and January 20, 2017, were published. (*Id*. at ¶¶ 14-15). But Building C was not actually ready for wall panel installation until after January 11, 2017, and Building D was not ready for wall panel installation until May 2017. (*Id*. at ¶¶ 16-17, 19, 40-41).

Finally, the Court notes that language in the MSA supported that Pike was required to grant Tri-Krete an extension of time until January 2018 to complete Building D. To that end, the MSA states as to Section 3.4:

> Should the Subcontractor be delayed by an act or omission of the Contractor or by any other contractor or subcontractor on the Project or by any cause beyond the Subcontractor's control and not due to any fault, act or omission on its part, then the time for completion of the work shall be extended for a period equivalent to the time lost by reason of any of the aforesaid causes, but only to the extent an extension of time is actually allowed to the Contractor by the Owner under the terms of the Prime Contract.

(Dkt. 83-3 at 11). As explained above, at the time the Owner Contract was executed, the parties agreed that the time for completion of Building D was "to be determined." Thereafter, the date for completion of Building D was reset for January 2018 (*see* Dkt. 88-30 at 4 (deposition testimony by Bill Tehan that Building D could not be completed by the fall semester, and "the college made the decision to move the completion of D to January . . . of 2018")), and Pike completed the building by December 8, 2017. Accordingly, Tri-Krete was "actually allowed" an extension to complete Building D.

In sum, there was no requirement that Building D be completed by a certain date, and the parties declined to update the Owner Contract to provide for a completion date. Pike's arguments fail to acknowledge the obvious—that since it had no obligation to deliver Building D by August 31, 2017, there *was* no delay in the completion of that building, and therefore no associated damages. Rather, as far back as when the Owner Contract was signed in June 2017—well before the original August 2017 deadline—there was no completion date for Building D. For those reasons, the Court concludes that Tri-Krete is entitled to summary judgment on the issue of Pike's ability to pursue time-related

damages after August 31, 2017. Pike is precluded from seeking time-related damages from Tri-Krete after that date.

### C. Failure to Mitigate

Tri-Krete's second argument is that it is entitled to summary judgment on whether Pike failed to mitigate its damages, since it is undisputed that Pike did not utilize the contingency amount of $2,683,759.00, which was included at Section 5.2.6 of the Owner Contract. In a breach of contract action, "a plaintiff ordinarily has a duty to mitigate the damages that he incurs," and that the duty to mitigate "applies to those damages that the plaintiff could have avoided with reasonable effort and without undue risk, burden, or expense." *U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 440-41 (S.D.N.Y. 2010). "The duty to mitigate damages . . . requires only reasonable, practical care and diligence, not extraordinary measures." *Id*. at 441. Further, "[t]he duty to mitigate damages comes into play once there has been a *breach* of a contract." *Id.*; *see also Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Morgan Stanley Mortg. Cap., Inc.*, No. 11 Civ. 505 (CM)(GWG), 2017 WL 698607, at *1 (S.D.N.Y. Feb. 10, 2017) ("[T]here is no such thing as 'pre-breach' mitigation. Only after a contract has been breached does a duty to mitigate damages arise.").

The defendant has the burden of proving a duty to mitigate, as well as that the plaintiff failed to make diligent efforts to mitigate its damages. *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 47 A.D.3d 103, 107 (1st Dep't 2007) ("It was defendants' burden to establish not only that plaintiff failed to make diligent efforts to mitigate its damages . . . but also the extent to which such efforts would have diminished its

damages."); *see also Wilkinson v. R. MacDonald Elec., Inc.*, No. 03-CV-6441, 2006 WL

8456460, at *2 (W.D.N.Y. July 10, 2006) ("[W]hile [the plaintiff] is required to mitigate

damages upon breach, the burden of proving a lack of diligent effort to mitigate damages

is upon the defendant." (quotations and citation omitted)).

 As an initial matter, despite that it is well-settled that Tri-Krete carries the burden

on the mitigation issue, its argument about Pike's alleged failure to mitigate is cursory at

best, and amounts to three conclusory sentences:

> In this case, a contingency fund for acceleration was available to Pike under
> the Owner Contract.  By failing to avail itself of this remedy, Pike failed to
> mitigate its damages as a matter of law.  By reason of the foregoing, Tri-
> Krete is entitled to partial summary judgment that Pike breached its duty to
> mitigate damages.

(*See* Dkt. 82-1 at 23).  In response, Pike relies on the declaration of Ms. Ciminelli, who

explains that the contingency fund item in the Owner Contract was an element of the

Guaranteed Maximum Price, on which Pike and Marist never agreed, and therefore the

contingency was unavailable to Pike.  (Dkt. 89 at 12).  Further, Pike argues that even if the

contingency fund had been agreed upon, the contingency fund was intended only for costs

incurred "to advance the schedule."  (*Id*. at 12-13; *see also* Dkt. 89-1 at ¶¶ 22-31 (Ciminelli

declaration)).

 In her declaration, Ms. Ciminelli explains that in June 2017, when Pike and Marist

executed the Owner Contract, the agreement provided that the Guaranteed Maximum Price

was "to be determined."  (Dkt. 89-1 at ¶ 24; *see also* Dkt. 82-16 at 4 (Owner Contract,

listing "Guaranteed Maximum Price" as "TBD")).  Since the Guaranteed Maximum Price

was not finalized for Phase 2 of the project, the contingency amounts set forth did not

become an element of Pike's compensation. (Dkt. 89-1 at ¶ 24). Ms. Ciminelli also explains that, even if the Guaranteed Maximum Price had been established, these contingency amounts would not have been available for the costs Tri-Krete claims—rather, they were required to be used "for acceleration and overtime costs, including those costs for approved labor, materials, means and methods utilized and/or implemented to advance the schedule." (*Id*. at ¶ 26*; see also* Dkt. 82-16 at 5 (Owner Contract, Section 5.2.6.2)). According to Ms. Ciminelli, since the costs claimed by Tri-Krete were not "to advance the schedule" but to recover time lost by Tri-Krete due to its own failures, Pike could not have used the contingency amount for such costs. (Dkt. 89-1 at ¶ 27). Ms. Ciminelli further explained that had there been a defined contingency as part of the Guaranteed Maximum Price, those contingency costs would have been paid by Marist, and as to the "unallocated contingency" amount Pike included in its applications for payment to Marist, that amount was not a dedicated contingency line item, but was rather used to communicate to Marist the difference between the budget amount of $49,100,000, and the then committed and spent dollars. (*Id*. at ¶¶ 28, 32-33).

In reply, Tri-Krete contends that the terms of the Owner Agreement contradict Pike's argument. Tri-Krete points to Exhibit F of the Owner Agreement—a "Projected Budget Summary Report." (Dkt. 94 at 10; *see also* Dkt. 82-16 at 39 (Owner Agreement, Exhibit F)). Tri-Krete argues that "the record is clear that while the $49,100,000 amount stated in Exhibit F was 'representative of projected costs,' that amount did in fact become the Guaranteed Maximum Price," and that other than Ms. Ciminelli's self-serving statements, Pike has failed to produce any evidence that the contingency in the Owner

Contract was modified, eliminated, or otherwise negotiated out of existence. (Dkt. 94 at 10).

The Court finds that, giving these differing accounts in the record about the contingency amount—including when it would have applied—there is an issue of fact about the contingency that a jury must resolve. *See, e.g.*, *Tang Cap. Partners, LP v. BRC Inc.*, No. 22-CV-3476 (RWL), 2024 WL 4716315, at *39 (S.D.N.Y. Nov. 8, 2024) (when the plaintiff should have started to take steps to mitigate is "a question of fact that the factfinder must resolve"). First, whether Pike could have accessed the contingency for the amounts claimed by Tri-Krete is unclear, including because that determination appears to hinge on whether those costs were "to advance the schedule"—which is the language included in the Owner Agreement—or whether they were to recover time lost by Tri-Krete due to its own failures. As acknowledged by Mr. Bombini, the fault for the delays at issue during Phase 2 of the project are "vigorously disputed" by the parties. Second, it is unclear from the record before the Court whether the contingency was a stand-alone line item or whether the parties intended that it be an element of the Guaranteed Maximum Price. While Tri-Krete claims that Ms. Ciminelli's declaration is "self-serving,"[2] it is Tri-Krete's burden to prove a failure to mitigate, and other than pointing to the Owner Contract (which does appear to list the contingency provision (Section 5.2.6.2) under the same section

---

[2] Tri-Krete also attacks Ms. Ciminelli's declaration as parol evidence and outside the four corners of an unambiguous contract. (Dkt. 94 at 9-10). The Court disagrees. As explained above, the structure and terminology used in the Owner Agreement is unclear as to the contingency, and ultimately it is Tri-Krete's burden to prove that Pike failed to mitigate its damages.

heading as the "GUARANTEED MAXIMUM PRICE" at Section 5.2), it provides no further clarification for its position that the contingency amount was final and agreed upon by the parties. Tri-Krete bears the burden of proving a failure to mitigate, and it has failed to sustain its burden of proving that Pike was required to mitigate its damages and whether it failed to make a diligent effort to mitigate damages. Accordingly, Tri-Krete's motion for summary judgment is denied as to the issue of mitigation.

III.    **Pike's Motion for Summary Judgment**[3]

Pike moves for summary judgment on three issues: (1) Tri-Krete's claims for damages relating to delay, schedule modification, acceleration, changes in sequence, and delays attributed to acts or omissions of Pike are waived and barred by the terms of the MSA; (2) Tri-Krete's claims otherwise waived and barred by the MSA should be dismissed based on Tri-Krete's failure to comply with contractual conditions precedent; and (3) Tri-Krete's second and third counterclaims, for unjust enrichment and account stated, must be dismissed. (Dkt. 83-29 at 6, 10-24).

---

[3]    Pike filed its statement of undisputed facts on April 30, 2024. (Dkt. 83-1). In contravention of the Court's Local Rules of Civil Procedure, the statement of facts does not include citations to admissible evidence. *See* L. R. Civ. P. 56(a)(1) (requiring that annexed to a motion for summary judgment shall be a separate, short, concise statement, in numbered paragraphs, of material facts, which "must be followed by citation to admissible evidence," and that "[f]ailure to submit such a statement may constitute grounds for denial of the motion."). More than three weeks after the motion was filed and only five days before Tri-Krete's response deadline, and perhaps realizing its error, Pike unsuccessfully attempted to file a corrected statement of undisputed facts, which the Court rejected. (Dkt. 85; Dkt. 87; Dkt. 92). Given Pike's failure to comply with the Local Rules, the Court may deny its motion on this basis alone.

**A. Relevant Facts**

According to Tri-Krete, the MSA between Pike and Tri-Krete was executed in October 2015 and in connection with a smaller project, prior to Phase 2 of the Marist project. (*See* Dkt. 88-2 at ¶ 3). In Tri-Krete's discussions with Pike concerning the Marist project, "no one from Pike ever suggested that the terms of the MSA would apply to [Tri-Krete's] Work Order for the Marist project." (*Id*.). Ms. Ciminelli maintains that the introductory paragraph of the June 14, 2016 Work Order references the MSA: "The Work covered by this Work Order will be performed under the Terms and Conditions of the original Master Subcontract Agreement dated 2/15/2015. In the event of any inconsistency, conflict or ambiguity between the Master Subcontract Agreement and this Work Order, the Work Order shall govern." (Dkt. 95-3 at ¶ 6).

As referenced above in connection with the factual background for Tri-Krete's partial motion for summary judgment, there were delays in the completion of the Marist project. (Dkt. 88-2 at ¶ 9). According to Tri-Krete, because of the delays it incurred costs in labor and materials, including overtime, and other costs used to accelerate its work, in an effort to advance the schedule to manufacture and install the wall panels. (*Id*. at ¶ 10). Tri-Krete presented these costs to Pike in various contract revisions. (*Id*.). Tri-Krete maintains that it sent emails and letters to Pike, repeatedly notifying Pike of numerous categories of additional costs incurred by Tri-Krete. (*Id*. at ¶ 11; *see also* Dkt. 88-3 (summary of correspondence between Tri-Krete and Pike)).

According to Pike, Tri-Krete did not provide written notice of the claims it made for damages, in particular Tri-Krete's Contract Revision requests totaling $1,979,184.55,

within the timeframe required by the MSA. (Dkt. 83-1 at ¶ 23). As a result, Pike's position is that it rejected Tri-Krete's revision requests as untimely and contrary to the terms of the MSA. (*Id*. at ¶ 24). Pike further contends that during its performance of the subcontract work, Tri-Krete executed and submitted Lien Waiver and Releases(s) dated May 25, 2017, in connection with its applications for payment, pursuant to which Tri-Krete released and discharged Pike and Marist from any and all claims respecting payment for the housing project. (*Id*. at ¶¶ 25-27).

Tri-Krete disputes Pike's position on the written notice. (Dkt. 88-1 at ¶ 23). Tri-Krete contends that Pike's representations, requests, and other conduct during the project were inconsistent with the terms of the MSA. (*Id*.). Tri-Krete also contends that Pike did not communicate its rejection of the claims for damages. (*Id*. at ¶ 24). Further, with respect to the lien waivers, Tri-Krete maintains that Pike tendered to Tri-Krete certain documentation that it required Tri-Krete to sign as a condition to receiving a long-delayed payment. (*Id*. at ¶ 25). Tri-Krete contends that Pike began to delay payments, and due to the late payments, and Tri-Krete's labor forces and suppliers demanding payment, Tri-Krete, under duress, was pressured by Pike into signing a lien waiver document. (Dkt. 88-2 at ¶ 29). Tri-Krete disputes the relevancy of the lien waiver, which is attached as Exhibit S to the Ciminelli declaration. (Dkt. 88-1 at ¶¶ 26-27; *see also* Dkt. 83-21).

### B. The "No Damages for Delay" Provisions

In support of its argument that it is entitled to summary judgment on Tri-Krete's claims for damages sustained relating to delay, Pike points to "no damages for delay" clauses included in the MSA. (Dkt. 83-29 at 10). The MSA states:

> **3.4 Delays** Should the Subcontractor be delayed by an act or omission of the Contractor or by any other contractor or subcontractor on the Project, or by any cause beyond the Subcontractor's control and not due to any fault, act or omission on its part, then the time for completion of the work shall be extended for a period equivalent to the time lost by reason of any of the aforesaid causes, but only to the extent an extension of time is actually allowed to the Contractor by the Owner under the terms of the Prime Contract. Subcontractor agrees to make no claim for damages for delay in the performance of this Master Subcontract Agreement occasioned by any act or omission to act of the Contractor or any of its representatives.
>
> . . .
>
> **5.6** The Contractor shall not be obligated or liable to the Subcontractor for, and the Subcontractor hereby expressly waives any claims against the Contractor on account of, any damages, costs or expenses of any nature which the Subcontractor or its subcontractors may incur as a result of any delays, interferences, suspensions, changes in sequence or the like, arising from or out of any act or omission of, or attributable to, the Contractor, it being understood and agreed that the Subcontractor's sole and exclusive remedy in such event shall be an extension of time, but only in accordance with the provisions of this Master Subcontract Agreement.

(*See* Dkt. 83-3 at 11, 15). In response to Pike's argument that the no damages for delay clauses are enforceable, Tri-Krete contends that both an exception applies that bars the enforcement of the no damages for delay provision, and also that because Pike materially breached the MSA, Tri-Krete may recover damages despite the presence of the no damages for delay provision in the MSA. (*See* Dkt. 88 at 10-23).

"Generally, a clause barring a contractor from recovering damages for delays in the performance of the work—commonly referred to as a no-damage-for-delay clause—is valid and 'will prevent recovery of damages resulting from a broad range of reasonable and unreasonable conduct by the contractee if the conduct was contemplated by the parties when they entered into the agreement.'" *BCI Constr., Inc. v. Bd. of Educ., Washingtonville Cent. Sch. Dist.*, 203 A.D.3d 794, 795 (2d Dep't 2022) (quoting *Corinno Civetta Constr. Corp. v. City of N.Y.,* 67 N.Y.2d 297, 305 (1986)).

Yet there are exceptions to the general enforceability of a no damages for delay provision. Even when a contract includes such a provision, "damages may be recovered for: (1) delays caused by the contractee's bad faith or its willful, malicious, or grossly negligent conduct, (2) uncontemplated delays, (3) delays so unreasonable that they constitute an intentional abandonment of the contract by the contractee, and (4) delays resulting from the contractee's breach of a fundamental obligation of the contract." *R-J Taylor Gen. Contracting, Inc. v. Fairport Cent. Sch. Dist.*, 170 A.D.3d 1603, 1604 (4th Dep't 2019) (quotations and citation omitted). For example, the failure of a contractor to supervise and coordinate the work of subcontractors on a construction site may preclude the enforcement of a no damages for delay provision. *See, e.g.*, *Clifford R. Gray, Inc. v. City Sch. Dist. of Albany*, 277 A.D.2d 843, 844 (3d Dep't 2000). Likewise, a no damages for delay provision may be found to be unenforceable where there is an "intentional abandonment" of the contract that renders it unenforceable—such as when an owner makes dramatic changes to the work or causes significant delay. *Bovis Lend Lease LMB v. GCT Venture*, 6 A.D.3d 228, 229 (1st Dep't 2004). As the party seeking to preclude the

enforcement of the no damages for delay provision, Tri-Krete bears the "heavy burden" of demonstrating that the provision does not apply. *Bovis Lend Lease (LMB), Inc. v. Lower Manhattan Dev. Corp*. 108 A.D.3d 135, 147 (1st Dep't 2013).

Although the subcontract includes this "no damages for delay" provision, there exist issues of fact that preclude granting Pike summary judgment on this issue—including that there is evidence in the record that there were uncontemplated and unreasonable delays caused by Pike, or delays resulting from Pike's breach of fundamental obligations under the contract. Tri-Krete has presented evidence that Pike's conduct actively interfered with Tri-Krete's performance of its duties outlined in the Work Order. (*See, e.g.*, Dkt. 88-2 at ¶ 9 (explaining that Pike interfered with Tri-Krete's "means and methods of the production" as well as the erection of the pre-cast wall panels); *id*. at ¶¶ 14-19 (documenting delays in dates scheduled for the wall panel installation); *id*. at ¶ 17 (as of January 11, 2017, due to a lack of necessary information, Tri-Krete had been unable to produce enough panels for commencement of panel installation to be efficient); *id*. at ¶ 20 (explaining that at one point, Tri-Krete had to stop installation since Pike had failed to complete the pouring of concrete slabs within Building D, which had to be completed before Tri-Krete could install wall panels); *id*. at ¶ 22 (discussing Pike's demand that Tri-Krete deliver panels to the construction site without first attaching the stone to the panels, which saved one or two days of production time, but caused weeks of delay and increases in cost, by forcing Tri-Krete to apply stone to the panels after the panels were on the building, which required the use of manlifts and other equipment to field-apply the stone); *id*. at ¶¶ 24, 36 (discussing crane costs incurred by Tri-Krete since wall panel installation

was idled by conflicting work); *id*. at ¶¶ 40-41 (explaining that Pike compressed Tri-Krete's installation of wall panels and other construction activities by a factor of 50 percent and, based on Mr. Bombini's experience in the construction industry, "it [was] ludicrous to even suggest that such a massive compression of the schedule was possible")).  While Pike offers its own version of facts which places the blame for delays on Tri-Krete (*see, e.g.*, Dkt. 83-2 at ¶¶ 11, 58 (Ciminelli declaration, explaining that some delays were caused by Tri-Krete's inability to timely fabricate, deliver, and install precast concrete wall panels)), those raise issues of fact appropriate for resolution at trial.

In addition, Tri-Krete has presented evidence that Pike breached the contract by failing to provide Tri-Krete with any extensions, as required under Section 3.4 of the MSA, despite that Marist allowed Pike an extension of time for the substantial completion of Buildings C and D.  (*See* Dkt. 83-3 at 11 ("Should the Subcontractor be delayed by an act or omission of the Contractor or by any other contractor or subcontractor on the Project, or by any cause beyond the Subcontractor's control and not due to any fault, act or omission on its part, then the time for completion of the work ***shall*** be extended for a period equivalent to the time lost by reason of any of the aforesaid causes. . . ." (emphasis added)); Dkt. 88-32 at 9-10 (deposition testimony by Ms. Ciminelli, acknowledging that "[t]he contract says if there's a delay, whether it's anybody's fault, they're entitled to an extension of time")).[4]

---

[4]     Ms. Ciminelli went on to testify that, "so if there's a written notification and there's a delay based on someone else causing the delay, then they would get an extension of time." (Dkt. 88-32 at 10).  But there is no written notification requirement in Section 3.4 of the MSA.

As explained above, the Work Order was executed on June 14, 2016. According to the "Guideline Schedule" attached to the Work Order, Building C was to be ready for wall panel installation on October 24, 2016, and Building D was to be ready for wall panel installation on November 30, 2016. (Dkt. 88-2 at ¶ 14; *see also* Dkt. 83-4 at 26 (Guideline Construction Schedule)). But the schedule for wall panel installation was pushed back multiple times. (Dkt. 88-2 at ¶¶ 15-16). Further, Pike pushed back the completion dates for Building C to June 27, 2017, and Building D to August 2, 2017. (Dkt. 88-32 at 4-8). Thereafter, Marist and Pike agreed in the Owner Contract that the date for substantial completion of Building D would be extended from August 2, 2017, to a date "TBD," or "to be determined." (*See* Dkt. 88-35 at 4 (Owner Agreement, listing "TBD" as "Substantial Completion Date" for Building D; *see also* Dkt. 88-30 at 4 (deposition testimony of Bill Tehan, that Marist made the decision to "reset" the completion of Building D to January 2018)). Pike completed Building D by December 8, 2017, and Marist sought no damages from Pike based on that completion date. In other words, Marist allowed Pike additional time to complete its work, and under Section 3.4 of the MSA, Pike was required to allow an equal extension of time to Tri-Krete. It is undisputed that Pike did not allow Tri-Krete a similar extension, and whether Pike breached or abandoned the contract by failing to provide an extension is a material issue of fact relevant to the issue concerning the no damages for delay clause. *See, e.g.*, *Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc.*, 807 F. Supp. 1007, 1021 (S.D.N.Y. 1992) (whether a contract has been abandoned "is generally a question of fact" to be determined by the jury).

Tri-Krete raises other arguments in opposition to Pike's motion for summary judgment as to the no damages for delay provision, including: the terms of the MSA do not apply, because the MSA pre-dated the Marist project; the Owner Contract provided a contingency for acceleration, which Pike should have utilized; Pike waived protection of the no damage for delay clause since it chose not to apply the clause to other subcontractors on the project with the same contract; and Pike's course of conduct undermines its claim that Tri-Krete was not entitled to compensation for delay. (Dkt. 88 at 19-23). Given it has already determined that there is an issue of fact about whether the no damages for delay provision applies, the Court need not reach these issues. Accordingly, Pike is not entitled to summary judgment on the issue of the no damages for delay provision.

### C. The Conditions Precedent

Pike next argues that some of Tri-Krete's claims for damages are barred because Tri-Krete failed to comply with contractual conditions precedent, which required Tri-Krete to provide written notice and documentation for any additional compensation it sought. (Dkt. 83-29 at 20). In response, Tri-Krete argues that Pike attempts to rely on certain provisions of the AIA A201 General Conditions of the Owner Contract, but because the AIA A201 General Conditions do not apply to Tri-Krete, that argument fails. (Dkt. 88 at 23-27). Tri-Krete further argues that Pike waived the condition precedent provision when it granted Schenectady Steel all its change orders, but refused to grant Tri-Krete's change orders under the same contract. (*Id*. at 27-29).

"A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement

arises." *Parlux Fragrances, LLC v. S. Carter Enters., LLC*, 204 A.D.3d 72, 85 (1st Dep't 2022) (citation omitted).  "An express condition—that is, one agreed to by the parties that must be literally performed (substantial compliance will not suffice)—must be reflected in clear, express language; courts are reluctant to interpret a contractual clause as a condition precedent in the absence of . . . unmistakable conditional language."  *Id.* (quotations, citations, and alterations omitted); *see also Ashkenazi v. Kent S. Assocs., LLC*, 51 A.D.3d 611, 611-12 (2d Dep't 2008) ("If the language is in any way ambiguous, the law does not favor a construction which creates a condition precedent.  A contractual duty will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition." (internal citation omitted)).  "Under New York law, express conditions precedent, which are those agreed to and imposed by the parties themselves, must be literally performed."  *Travelers Cas. & Sur. Co. v. Dormitory Auth. - State of N.Y.*, 735 F. Supp. 2d 42, 75 (S.D.N.Y. 2010) (quotations, citation, and alteration omitted).

There are several issues with Pike's argument on the conditions precedent issue that the Court finds precludes granting it summary judgment as to this claim.  First, Pike's argument about the conditions precedent issue is conclusory at best (*see* Dkt. 83-29 at 21 ("Tri-Krete's failures to satisfy the written notice of claim **and** detailed documentation requirements of the contract are fatal and mandate dismissal.")), and in fact in its memorandum of law, Pike does not specify the precise "condition precedent" language on which it relies or provides any meaningful analysis of that language—rather, Pike refers only generally to the "condition precedent notice requirements set forth in the Subcontract" (*id.* at 20).

Pike's motion suggests that it is attempting to rely on certain provisions in the Owner Contract to argue that Tri-Krete's claims are barred.  (*See* Dkt. 83-1 at ¶¶ 16-17 (Pike's statement of undisputed facts, reciting Sections 15.1.2 and 13.3 of the AIA A201, providing for "Notice of Claims" and "Written Notice)).[5]  Further, Section 5.9 of the MSA provides that "[t]he Subcontractor shall furnish all notices and information within the time required under the Prime Contract to enable the Contractor to timely assert a claim or a defense of the Subcontractor."  (*Id*. at ¶ 13; *see also* Dkt. 83-3 at 15 (MSA)).  But it is unclear on the record before the Court that the written notice provisions in the Owner Contract were incorporated by reference into either the MSA or into the Work Order.

> "Under New York law, 'a paper referred to in a written instrument and sufficiently described may be made a part of the instrument as if incorporated into the body of it.'"  *PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1201 (2d Cir. 1996) (quoting *Jones v. Cunard S.S. Co.,* 238 A.D. 172, 173, 263 N.Y.S. 769 (2d Dep't 1933)).  It must be clear that the parties knew of and consented to the terms to be incorporated by reference for these terms to be valid.  *Id.; see Lamb v. Emhart Corp.,* 47 F.3d 551, 558 (2d Cir. 1995).  The papers to be incorporated by reference into the document "must be so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt."  *Chiacchia v. Nat'l Westminster Bank USA,* 124 A.D.2d 626, 628, 507 N.Y.S.2d 888 (2d Dep't 1986).

*Creative Waste Mgmt., Inc. v. Capitol Env't Servs., Inc.*, 429 F. Supp. 2d 582, 602 (S.D.N.Y. 2006).  Both of the agreements between Pike and Tri-Krete—the MSA (dated October 2, 2015) and the Work Order (dated June 14, 2016)—pre-date the Owner Contract, which was not signed until over one year later on June 21, 2017.  In other words, to the

---

[5]     The AIA A201 General Conditions that Pike has submitted with its motion—which can be found at Dkt. 83-5—appear to be for Phase 1 of the Marist project (for the construction of Buildings A & B), and not for Phase 2 of the project—the subject of this case.

extent Pike is attempting to bind Tri-Krete to conditions precedent that existed in the Owner Contract, Tri-Krete could not have known the terms of the Owner Contract and consented to them at the time it entered into either the MSA or the Work Order.  Without further elaboration from Pike, it is unclear why it believes it may bind Tri-Krete to these conditions retroactively.  *See, e.g.*, *Lamb v. Emhart Corp.*, 47 F.3d 551, 558 (2d Cir. 1995) ("In order to uphold the validity of terms incorporated by reference it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.  When a contract binds parties to terms that are to be decided in the future by one of the parties, the elements of knowledge and assent may be missing.").  Pike's reply memorandum of law does not respond to Tri-Krete's argument that any written notice requirement was not incorporated by reference, nor does it address the fact that the Owner Contract was executed following the MSA and the Work Order.  (*See* Dkt. 95-14).

Further, "New York law permits an extra work damages claim for extra work, orally directed, outside the scope of the contract, notwithstanding the provision that a claim for extra work must be supported by written authorization."  *U.S. for Use & Benefit of Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 165 (2d Cir. 1996) (quotations and citation omitted); *see also Superior Site Work, Inc. v. NASDI, LLC*, No. 2:14-cv-01061 (ADS)(SIL), 2018 WL 3716891, at *21 (E.D.N.Y. Aug. 3, 2018) ("[T]he law in New York states that when a party knowingly receives and accepts the benefits of extra work outside the scope of a construction contract orally directed by himself and his agents, such conduct constitutes a waiver of the requirement that the extra work be performed pursuant to a writing." (quotations, citation, and alteration omitted)).

Here, Tri-Krete has presented evidence supporting that Pike directed it to perform work outside the scope of the contract. (*See, e.g.*, Dkt. 88-2 at ¶ 22 (discussing that Pike demanded that Tri-Krete deliver panels to the site without first attaching the stone, which forced Tri-Krete to incur additional work and costs); *id*. at ¶ 24 (discussing additional crane costs incurred and implications of changes Pike demanded to Tri-Krete's production processes); *see also id*. at ¶ 18 (Mr. Ketchum told Mr. Bombini that Pike would "deal with any associated costs")). Again, Pike's reply memorandum of law does not respond to the arguments raised by Tri-Krete in opposition to the condition precedent argument—rather, Pike addresses only the "no damages for delay" argument.

Finally, Tri-Krete has presented evidence that Pike may have waived the condition precedent provision when it granted another subcontractor on the Marist project, Schenectady Steel, all its change orders, but refused to grant Tri-Krete's change orders under the same contract. (Dkt. 88 at 27). "Waiver is the voluntary and intentional relinquishment of a contract right" and "it cannot be inferred from mere silence." *Coniber v. Ctr. Point Transfer Station, Inc*., 137 A.D.3d 1604, 1606 (4th Dep't 2016) (internal quotations and citations omitted). "This intent [to waive] must be clearly established and cannot be inferred from doubtful or equivocal acts or language." *Salomone v. Abramson*, 5 N.Y.S.3d 838, 848 (Sup. Ct., N.Y. Cnty. 2015) (quoting *E. 56th Plaza, Inc. v. Abrams*, 91 A.D.2d 1129, 1130 (3d Dept. 1983)). "The party raising the defense of waiver has the burden of proving it." *Id*.

In support of its argument that Pike waived the written notice requirement, Tri-Krete has presented deposition testimony by Jeffrey Hoffman, the Senior Project Manager of

Schenectady Steel Company, Inc.  (*See* Dkt. 88-28).  Mr. Hoffman explained that when

Schenectady Steel began working on Phase 2 of the Marist project, the timing of the

fabrication of steel was impacted by design changes, which caused Schenectady Steel to

do more work than originally planned.  (*Id*. at 4-5).  When Schenectady Steel submitted

design change orders for additional work, it was compensated for these changes, despite

not giving notice of potential change orders.  (*Id*. at 5-6, 29).  Again, Pike does not respond

to this argument in its reply memorandum of law.[6]

For those reasons, Pike has failed to carry its burden of demonstrating that there is

no issue of material fact about whether Tri-Krete was required to comply with a mandated

condition precedent in the contract.  Accordingly, the Court denies summary judgment on

this issue.

### D.  Unjust Enrichment and Account Stated

Pike also seeks summary judgment on Tri-Krete's second and third counterclaims

for unjust enrichment and account stated.  (Dkt. 83-29 at 22).  Pike argues that Tri-Krete

cannot claim unjust enrichment, since the existence of a valid and enforceable contract

governing a particular subject matter precludes recovery in quasi-contract.  (*Id*.).  Pike

likewise contends that the account stated claim is duplicative of its breach of contract claim

---

[6]    Pike appears to attempt to address this argument in the declaration from Ms. Ciminelli submitted in connection with its reply papers, wherein Ms. Ciminelli explains why Schenectady Steel was granted change orders for additional compensation.  (*See* Dkt. 95-3 at ¶¶ 23-29).  The Court should not have to search for counsel's reply to arguments raised in an opposing memorandum of law—rather, the legal arguments advanced by the parties should be readily laid out in the memoranda of law submitted to the Court.  To the extent Ms. Ciminelli's recounting of what occurred conflicts with that of Mr. Hoffman's account, that is an issue for the factfinder to resolve.

and should be dismissed. (*Id*. at 23). In response, Tri-Krete argues that because Pike abandoned the MSA, including because it failed to provide Tri-Krete with an extension of time as it was required to do under the terms of the no damage for delay clause, Tri-Krete is entitled to a quasi-contractual remedy. (Dkt. 88 at 29-31). Again, Pike does not address this argument in its reply memorandum of law.

As to Tri-Krete's assertion of both a breach of contract and unjust enrichment claim against Pike, it is true that generally, where a valid contract exists, an unjust enrichment claim is precluded as duplicative. *Aubrey v. New Sch.*, 624 F. Supp. 3d 403, 423-24 (S.D.N.Y. 2022). However, "where there is a bona fide dispute as to the existence of a contract or the application of a contract in the dispute in issue, a plaintiff may proceed upon a theory of quasi contract as well as breach of contract." *Scarola v. Ellis LLP v. Padeh*, 116 A.D.3d 609, 611 (1st Dep't 2014) (citation omitted).

Here, one theory advanced by Tri-Krete is that Pike abandoned the MSA by not providing an extension of time as it was required to do under the no damages for delay provisions. Accordingly, Tri-Krete may recover for damages it sustained for providing work outside the scope of the contract. *See, e.g.*, *Corinno Civetta Constr. Corp.*, 67 N.Y.2d at 309 (damages may be recovered for delays resulting from the contractee's breach of a fundamental obligation of the contract); *R-J Taylor Gen. Constr. Corp.*, 170 A.D.3d at 1605 (explaining that a "request for delay damages does not constitute a claim as defined by the contracts," but "seeks relief wholly outside the scope of the contracts.")

As to the account stated claim, Tri-Krete maintains that the counterclaim for account stated was part of the issues previously arbitrated in the case, and is not a proper issue for

Pike's summary judgment motion. (Dkt. 88 at 31). Separate and apart from that issue, some recent New York case law supports that such a claim is "an independent cause of action that can be asserted simultaneously with a breach of contract claim," and "should not be dismissed as duplicative of a breach of contract claim." *Aronson Mayefsky & Sloan, LLP v. Praeger*, 228 A.D.3d 182, 187 (1st Dep't 2024). Further, "[w]here an account stated claim entitles a plaintiff to different damages from the breach of contract claim, it is not duplicative." *Cont'l Cas. Ins. Co. v. Contest Promotions NY, LLC*, No. 15-CV-501 (MKB), 2016 WL 1255726, at *4 (E.D.N.Y. Mar. 28, 2016) (citing *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008)). Accordingly, Pike is not entitled to summary judgment on Tri-Krete's unjust enrichment claim.

## CONCLUSION

For the foregoing reasons, Tri-Krete's motion for partial summary judgment (Dkt. 82), is granted in part and denied in part, and Pike's motion for partial summary judgment (Dkt. 83) is denied.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:       March 24, 2025
             Rochester, New York